UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

**Ethan and Nicole Caliva,**
6532 Vista Ave.
Milwaukee, WI 53213,

        Plaintiffs,                      Case No.: 26CV301

-vs-

**Equity Sales Finance, Inc.,**
13570 Grove Dr #367
Maple Grove, MN 55311,
    Registered agent for service of process:
    JENNIFER IVERSON
    15 SHADE TREE CT
    MADISON , WI 53717
-and-
**Gallant Law Group, P.C.**,
123 S. Broad Street, #1640
Philadelphia, PA 19109
-and-
**Robert M. Tobia,**
123 S. Broad Street, #1640
Philadelphia, PA 19109
-and-
**David S. Glanzberg,**
123 S. Broad Street, #1640
Philadelphia, PA 19109

        Defendants

---

## COMPLAINT

---

**NOW COMES,** the plaintiffs Ethan and Nicole Caliva**,** by and through their attorneys, Attorney Briane Pagel and LawtonCates, S.C., and as and for a complaint against the above-named defendants and hereby allege as follows:

1

## Parties:

1. **Plaintiffs Ethan and Nicole Caliva** are individual Wisconsin citizens who reside at 6532 Vista Ave., Milwaukee WI 53213. The Calivas are married.
2. **Defendant Equity Sales Finance, Inc. ("Equity")** is upon information and belief a company organized under the laws of the State of Minnesota, with a principal place of business located at 13570 Grove Dr #367, Maple Grove, MN 55311. Equity engages in lending money to individuals which individuals use that money for their own personal or family purposes. The transaction outlined herein is an example of the types of transactions which form the bulk of Equity's income and business. The majority, if not all, of Equity's actions to further its business take place in Minnesota, and the majority, if not all, of the person or persons who are responsible for directing Equity's actions are located in Minnesota.
3. **Defendant Gallant Law Group, P.C., ("Gallant")** is upon information and belief a company engaged in the purported practice of law, with a principal place of business located at 123 S. Broad Street, #1640, Philadelphia, PA 19109.
4. **Defendant Robert M. Tobia** is an individual citizen of Pennsylvania. Tobia purports to be an attorney practicing law in the state of Minnesota and has a principal place of business located at 123 S. Broad Street, #1640, Philadelphia, PA 19109.
5. **David S. Glanzberg,** is an individual citizen of Pennsylvania. Glanzberg purports to be an attorney practicing law in the state of Minnesota and has a principal place of business located at 123 S. Broad Street, #1640, Philadelphia, PA 19109.
6. Defendants Gallant Law, Tobia and Glanzberg will be collectively referred to as "the Gallant defendants." Allegations that the "Gallant defendants" did or failed to do something or said or failed to say something mean that an employee or authorized agent was the person acting or failing to act. This employee or agent may be one of the named individual defendants, but may also be a different employee or agent.

## Jurisdictional Allegations:

7. The claims herein are brought under federal statutes, and thus this Court has jurisdiction pursuant to 28 USC Sec. 1331.
8. Plaintiffs further seek more than $75,000 in damages apiece, and all defendants are citizens of a state other than Wisconsin, and this Court therefore has jurisdiction pursuant to 28 USC 1332.
9. This Court has jurisdiction over the supplemental state law claims pursuant to 28 USC 1367.

## The Calivas are induced into hiring a the Gallant defendants:

10. In and around early 2023, the Calivas became concerned about their ongoing ability to pay their debts based on their family circumstances.
11. Ethan Caliva began looking for options to deal with the Calivas' debt, searching on the internet for options.
12. Ethan Caliva at that time received an unsolicited phone call in which the caller said he would "introduce" Ethan to a debt resolution company. The caller asked Ethan questions about his debt issues, and based on that information, the caller told Ethan that the debt resolution company could help him with that debt.
13. Ethan told the caller that he Ethan was skeptical of the claims this caller made and did not agree to be "introduced" to the debt resolution company.
14. The same caller called Ethan back a short time later, and told Ethan that if he were to follow through with the debt resolution company, the company could settle his debts for "pennies on the dollar," which Ethan understood to mean that the Calivas could rid themselves of debt by paying his creditors only a small fraction of what he owed.
15. Ethan questioned the caller to try to determine if he should proceed. In response to his questions the caller said (among other responses) that the debt resolution company could "cancel" his debt. Ethan understood this to mean that the debt resolution company would arrange it so that the Calivas could rid themselves of debt without paying their creditors anything at all; the caller said that if the debt resolution company was not able to cancel

their debt entirely, the second step would be to resolve their debt for "pennies on the dollar."

16. Ethan understood those representations to mean that the debt resolution company could get rid of the Calivas' debts without the Calivas paying their creditors any money at all, and that only if the debt resolution company was unable to "cancel" their debt in that manner would the next step – elimination of debt by paying "pennies on the dollar" to their creditors – be pursued.
17. Ethan told the caller that he believed this information was too good to be true. The caller then gave Ethan an example of the type of help the debt resolution company could give; the caller told Ethan that the interest rates the Calivas were paying on their debts were too high, and that based on those interest rates alone, the debt resolution company could make claims against the Calivas' creditors which claims would reduce or eliminate the Calivas' debt.
18. The caller alleged in the foregoing was either an employee of the Gallant defendants, or was authorized by the Gallant defendants to make the representations alleged herein on behalf of the Gallant defendants.
19. The Gallant defendants were at all times material to this case aware of the claims and representations its employees and agents were making on their behalf; this awareness came from (upon information and belief) instructions given by the Gallant defendants, monitoring or reviewing calls made, or learning of the representations by other means such as being told about those representations by prospective clients.

### The Calivas enter into contracts with the Gallant defendants.

20. At the time of the phone calls regarding the debt resolution company, Ethan had been looking for a loan which he could use to pay off the debts via consolidation, lowering their payments without damaging their credit or subjecting them to lawsuits. Ethan had an agreement with a lender for a $25,000 loan.
21. Immediately after agreeing to enter into a contract with the Gallant defendants, Ethan became nervous and quickly called the Gallant defendants back to discuss his concerns.

4

In this call, the Gallant defendants' employee reassured Ethan that the debt program would work, and in particular said that JP Morgan would "drop" his debt "right away."

22. After agreeing with the caller to enter into a contract with the Gallant defendants, the Calivas received a call from a woman.

23. The Calivas did not know who the woman worked for, but she represented to them that she had authority to make agreements on behalf of the Gallant defendants and Equity.

24. The woman told the Calivas that they would have to pay $298 per month to Equity for 15 months. Based on the conversation with the woman, the Calivas believed these payments would be directed or applied to the Gallant defendants' fee, and thought that Equity was a middleman arranging the transaction.

25. Based on the representations that had been made to them over the phone, the Calivas agreed to hire the Gallant Law Group.

26. The Gallant defendants required the Calivas to enter into a written agreement which they called a Retail Installment Contract. A true and correct copy of this agreement is appended to this complaint as <u>Exhibit B</u>.

27. The cost to retain the Gallant Law Group was a flat fee of $4,000. To pay that fee, the Gallant defendants arranged for the Calivas to borrow $4,000 from Equity.

28. The Gallant defendants then submitted an application for credit on behalf of the Calivas to Equity, which application was approved.

29. Upon information and belief, Equity then paid Gallant Law $4,000, which payment was made before the Gallant defendants had done *any* work on behalf of the Calivas, let alone all the work they were supposed to do.

30. On January 24, 2023, the Gallant defendants submitted the Calivas' application for financing to Equity.

31. Also on January 24, 2023, Ethan Caliva signed a power of attorney giving Gallant Law Group the authority to (among other things) respond to legal proceedings brought against Ethan

32. Also on January 24, 2023, defendant Tobia personally sent an email to the Calivas. A true and correct copy of that email is appended to this complaint as <u>Exhibit A</u> and incorporated herein by reference as though set forth fully at this point.

33. In Exhibit A, Tobia personally promised (among other things) that "We" will:

5

a. Immediately give notice to the Calivas' creditors that the Calivas are represented,
b. Represent the Calivas in court if any of their creditors pursue legal action,
c. Dispute the legality of the Calivas' debts,
d. Defend "any action" brought by the Calivas' creditors,
e. Defend the Calivas against "the collection activities of [their] creditors."

### The Calivas asked their lawyers to help them, but get no help.

34. After entering into the agreements, the Gallant defendants told the Calivas to stop paying the enrolled debts that were the subject of the agreements.
35. The Calivas at the time of this instruction could have continued paying those debts for at least some time.
36. The Gallant defendants instructed the Calivas to send any communications related to the enrolled debts to them.
37. The Gallants defendants instructed the Calivas to not answer any phone calls from creditors, or if the Calivas did answer such a call, they should advise the caller that they were represented by the Gallant defendants and give the caller Gallant's contact information.
38. When the Calivas sent documents related to the enrolled debts to the Gallant defendants, they often would receive no responsive communications, and the Calivas would generally have to call or email a follow-up to get any response to the documents sent.
39. On some occasions, when the Calivas were finally able to get a response to a document related to an enrolled debt, the Gallant defendants responded by telling the Calivas that the Gallant defendants could not do anything, or alternatively would not do anything, unless and until the Calivas received a summons related to the debt. This did not comport with how the Calivas understood the agreements and the Gallant defendants' obligations, but the Calivas as lay people were unaware of what options they might have if the Gallant defendants did not comply with the agreement.
40. On several occasions, when the Calivas inquired about what the Gallant defendants were doing for the Calivas, the Gallant defendants told the Calivas that they were sending out "cease and desist" letters to creditors.

41. The Calivas never saw any "cease and desist" letters which were purportedly sent to their creditors.
42. The customer service representative of the Gallant defendants changed frequently, so often the Calivas were dealing with a brand new person who seemed unfamiliar with their matters.
43. Eventually, the Calivas became upset with how their matters were being handled and asked to speak to a manager. They were given a direct line to someone named "Brandon Johnson," but after approximately a week, Brandon stopped answering calls from the Calivas.
44. The Calivas on several occasions had to contact their creditors on their own to attempt to negotiate because the Gallant defendants refused or failed to do so.
45. The Calivas also had to contact creditors on their own on several occasions where the Gallant defendants had engaged in "negotiation" but the offers the Gallant defendants made to the Calivas creditors were *higher* than the balance the Calivas owed on the account, meaning that the Gallant defendants had offered to have the Calivas pay their creditor more than they actually owed.

## The Citibank Lawsuit:

46. In November 29, 2023, Nicole Caliva was sued by Citibank in Milwaukee County case number 23 SC 31479 (the "Citibank case."). This suit sought to collect one of the enrolled debts.
47. Pursuant to the Gallant defendants' instructions, the Calivas forwarded the summons and lawsuit papers to the Gallant defendants, but did not receive any response to those papers.
48. The Calivas then contacted the Gallant defendants to ask what they were going to do about the Citibank case. Initially, those defendants told the Calivas that the court date was passed and there was nothing they could do. This was not true, as the court date had not passed and even if it had, small claims cases can be reopened for good cause, so there was at least one, if not more, things the Gallant defendants could do even if the court date had passed.

49. The Gallant defendants also told the Calivas that the Calivas had never sent the court papers in. This was false.
50. The Gallant defendants also told the Calivas that they could not represent Nicole because she was not part of the agreement. The Calivas noted that Nicole had signed the agreement and were then told that Nicole must also sign a power of attorney in order for the Gallant defendants to help her in the Citibank case. Nicole Caliva signed the required form.
51. The Calivas then understood that the Gallant defendants were going to represent them in the Citibank case, Gallant did not do so.
52. The Gallant defendants "negotiated" with Citibank by offering to have the Calivas pay $2,400 in a lump sum, or by having the Calivas pay $260 per month over twelve months, which would equal $2,700. The Calivas could not afford the lump sum payments.
53. The Calivas sought other legal help and eventually retained Lawton Cates and Attorney Pagel entered an appearance in the Citibank case.

### The Synchrony Bank case

54. On January 3, 2024, Ethan Caliva was sued by Synchrony Bank in small claims court, Milwaukee County case number 24 SC 46 (the "Synchrony case"). This suit sought to collect one of the enrolled debts.
55. The "return date" for the Synchrony case was January 23, 2024.
56. Ethan called the Gallant defendants immediately upon being served in the Synchrony case. Ethan also emailed documents to the Gallant defendants.
57. On January 5, 2024, the Gallant defendants acknowledged receiving legal documents from the Calivas, and told the Calivas they would
    a. "verify" the documents "directly with the courts,"
    b. "make contact with the opposing counsel" to settle the debt before the court date, and
    c. Call the Calivas within 5-7 business days to discuss the matter.
58. Ethan did not hear back from Gallant until after 5 pm on January 19, when they sent a motion that the Calivas were supposed to file *pro se*.

59. The motion provided by the Gallant defendants was a motion for a continuance. The Gallant defendants incorrectly told Caliva that a motion for a continuance was the same as an "Answer."
60. The Gallant defendants told the Calivas that filing the motion "lessens the potential of having to show up in court." This is incorrect; Milwaukee County requires a personal appearance from all defendants in small claims court.
61. The Gallant defendants did not provide the Calivas with a deadline to file the motion.
62. The Gallant defendants also told the Calivas at that time that if a judgment was entered against the Calivas in the case, it would no longer assist the Calivas with that debt.
63. Ethan Caliva was not able to file the motion on his own and asked the Gallant defendants to help him. The Gallant defendants did not help him with the motion.
64. The Gallant defendants then had the Calivas provide financial information to them and a letter of hardship. The Calivas understood this to be intended to use for defending them against the lawsuit and for negotiating a resolution of the debt.
65. The Gallant defendants asserted that they had worked out a resolution of the Synchrony debt, but the amount that the Calivas were supposed to pay for this resolution was higher than the original debt.
66. On January 23, 2024, a default judgment was entered against Ethan in the Synchrony case.
67. Ethan Caliva then, *pro se,* negotiated a stipulated resolution to the Synchrony case; this resolution required him to pay $2,194.65 to Synchrony in two installments, one in January 2024 and one in February 2024.

### First Cause of Action:
### Violation of 15 USC 1679b:

68. Reallege and incorporate the foregoing as though set forth fully at this point.
69. The Gallant defendants each use instrumentalities of interstate commerce to sell and perform services, which they do in exchange for payment of money.
70. The services the Gallant defendants sell and claim they will perform include but are not limited to actions which are intended to improve a consumer's credit record, history or rating, as well as providing advice to consumers on how to do those things.

71. The Gallant defendants both directly and indirectly represented to the Calivas that their services would help improve the Calivas' creditor record and rating by, for example, promising to take actions to determine if debts are being properly and legally reported, and to dispute debts on the "three major credit bureaus," as well as file suit to enforce the Calivas' rights to be free from erroneous credit reporting. These actions were directly and indirectly intended to convey to the Calivas that as a result of the Gallant defendants' actions, the Calivas' credit would improve.

72. The Gallant defendants made and used untrue and misleading representations of the services they would offer. The claims that Tobia made in his email about what the Gallant defendants would do were false, untrue, and misleading, for a variety of reasons including but not limited to:

    a. At the time of making the statements, the Gallant defendants were not licensed to practice in Wisconsin, but their statements made it seem as though they could practice law in the Calivas' jurisdiction, and

    b. At the time of making the statements, the Gallant defendants had no present intention of actually performing any legal services on behalf of the Calivas, which can be inferred from the fact that the Gallant defendants never actually undertook to do any of the actions that would constitute appearing in court and defending the Calivas; and, further, the Gallant defendants at all times material hereto had no way of quickly appearing in court on behalf of the Calivas, and would have had to find local counsel to do so; local counsel would expect to be paid, as well, and the $4,000 that Gallant received for these services would become more and more insufficient the more representation was required, allowing an inference that the Gallant defendants never intended to provide any legal services, let alone appearing in numerous lawsuits or paying another lawyer to do so on behalf of the Calivas.

    c. The Gallant defendants' actions and inactions as alleged herein constitute both direct and indirect acts, practices, and course of business which have resulted in the commission of a fraud, to wit: the Gallant defendants defrauded the Calivas into paying them $4,000, for which the Gallant defendants did not and will not ever do a reasonable amount of legal work.

73. The Gallant defendants further accepted payment in advance from the Calivas before they had fully performed all services they were required to provide.
74. The Calivas are entitled to an award of actual damages, a refund of their money, and punitive damages.

**Second Cause of Action:**
**Misrepresentation/Violation of Section 100.18, Wis. Stats.**

75. Reallege and incorporate the foregoing as though set forth fully at this point.
76. The Gallant defendants represented to the Calivas that their services would allow the Calivas to get out of debt for all "enrolled debts" without any payment to the creditors, or, at worse, by paying "pennies on the dollar" to those creditors.
77. The Gallant defendants also promised to provide legal representation to the Calivas with respect to their debts, including representing them in court.
78. The Gallant defendants made those promises intentionally, and with the intent to induce the Calivas into hiring them; alternatively, the Gallant defendants did not care whether the representations were true or false, or knew or should have known that they were false. At the time of making those statements, the Gallant defendants knew nothing about the underlying nature of the Calivas' transactions, knew very little about the Calivas' financial situation, and knew nothing or next to nothing about Wisconsin law.
79. The representations were false, because at no time were there facts in existence which would have allowed a reasonable person to believe that the Calivas' creditors lacked the right to enforce their debts and/or would accept nominal payments on those debts, and experienced lawyers who run 7 or more different law firms at a time should have known that.
80. The Calivas relied on the representations and acted reasonably in doing so, as they did not have the legal sophistication to know that what the Gallant defendants were promising was not going to be possible, and the Calivas had no reason to believe that the Gallant defendants were lying.
81. The Gallant defendants have thus committed common law misrepresentation and violated section 100.18, Wis. Stats., as well.

11

### Third Cause of Action:
### Breach of Fiduciary Duty:

82. Reallege and incorporate the foregoing as though set forth fully at this point.
83. Attorneys are fiduciaries of their clients.
84. The Calivas hired the Gallant defendants as their lawyers.
85. The actions alleged herein above constitute intentional breaches of the Gallant defendants' fiduciary duties, and have caused damage to the Calivas.

### Fourth Cause of Action:
### Legal Malpractice:

86. Reallege and incorporate the foregoing as though set forth fully at this point.
87. The Gallant defendants owed a duty of care to the Calivas in the rendition of legal services.
88. The Gallant defendants breached that duty of care by their actions herein.
89. The Calivas have suffered damages as a result of the Gallant defendants' negligence.

### Fifth Cause of Action:
### Holder In Due Course Liability:

90. Reallege and incorporate the foregoing as though set forth fully at this point.
91. Equity is the current holder of the installment sales contract between the Calivas and the Gallant defendants.
92. Equity is thus liable to the Calivas for all claims that could be brought against the Gallant defendants to the extent of the amount of money equity has received from the Calivas.

### Individual Liability:

93. Reallege and incorporate the foregoing as though set forth fully at this point.
94. At all times material hereto, the two individual defendants, Tobia and Glanzberg, had complete control over the Gallant Law Group.

95. Tobia and Glanzberg at all times material ignored the corporate firm of the Gallant Law Group and used it to engage in the activities alleged herein, including not just the activities alleged by the Calivas but activities against other consumers as alleged herein.
96. To the extent that Tobia and Glanzberg were the Gallant Law Group employee who took any of the illegal actions herein, that person is liable for his own torts regardless of the existence of any corporation.

## Damages:

97. Reallege and incorporate the foregoing as though set forth at this point.
98. The Calivas have incurred over $4,000 in debt as a result of the foregoing and have to pay that money back, with interest.

## Emotional Distress:

99. The Calivas have suffered emotional distress as a result of the defendants' actions. Nicole suffered anxiety that was "through the roof" in its intensity, and she was overcome with waves of anxiety and worry about their ability to defend lawsuits. Nicole was in an advanced pregnancy at one point when the Gallant defendants told her she would have to go in person, by herself, to court to answer a lawsuit. Ethan spent hours attempting to find options to handle these debts now that they were in default, including looking into lenders who could make high-interest loans. Ethan had trouble sleeping because of his worry and often found himself staying awake trying to research options for dealing with the mess that the defendants had caused. Ethan also approached friends for financial help, actions he felt were humiliating because he had to disclose the entire situation to them. Both the Calivas felt short-tempered and had to be careful around each other and their daughter to avoid arguments.
100. Ethan Caliva also had to devote substantial time to try to deal with the Gallant defendants, and to fix the problems the Gallant defendants caused, reducing the amount of time Ethan could devote to his work and lowering his income.

101. The Calivas had trouble making payments on their other obligations due to the money they were paying to the defendants, and as a result paid some bills late. The Calivas also opted to skip vacations because they were not sure how much money they would need to deal with the enrolled debts.

**Punitive Damages:**

102. In March 2025 the Oregon Department of Consumer and Business Services issued a cease and desist order to the Gallant defendants. The Oregon Department found:
    a. Tobia and Glanzberg owned Gallant Law, which was previously known as "Valiant Law Group PC."
    b. Neither of the two individual defendants were licensed to practice law in Oregon.
    c. Gallant Law had entered into agreements with at least 104 Oregon consumers who paid $81,639.07 in fees to Gallant Law.
    d. After the Oregon Department began investigating Gallant law, Gallant law refunded $5,046.66 to those Oregon consumers.
103. Based on those findings, the Oregon Department ordered Gallant Law to pay $121,000 in penalties.
104. Defendant Tobia was, on January 7, 2026, publicly reprimanded by the Supreme Court of Pennsylvania. The reason for this reprimand were that the Supreme Court of Pennsylvania found that:
    e. Tobia and Glanzberg operated seven different "debt settlement firms," and
    f. These firms, including defendant Gallant Law Office, were in many instances operated by laypeople, not lawyers, and that this meant that laypeople were creating attorney-client relationships without providing information they were required to provide, and
    g. The websites for the debt settlement firms did not comply with Pennsylvania rules, and
    h. Tobia violated Pennsylvania's rules regarding lawyer conduct during his representation of 22 consumers who had hired one of his companies to help with debt resolution.

105. Upon information and belief, the defendants in this case acted intentionally, and in an intentional disregard of plaintiffs' rights, and accordingly punitive damages are warranted.

**WHEREFORE** the plaintiffs request the Court award them such damages, costs, fees, and other relief as may be just and equitable.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES IN THIS ACTION.**

Dated: This 2$^{3rd}$ day of February, 2026.

**LawtonCates, S.C.**
Attorneys for Plaintiffs, Ethan & Nicole Caliva
*Electronically Signed By:*

*/s/ Briane F. Pagel*
Attorney Briane F. Pagel
State Bar No. 1025514

P.O. Address:
1050 E. Washington Ave. Ste. 330
P.O. Box 2965
Madison, WI 53703
P: 608.282.6200/F: 608/975.2662
bpagel@lawtoncates.com